ARTHUR G. LEVO, Plaintiff and Appellant, v. GENERAL-SHEA-MORRISON, and LIBERTY NATIONAL INSURANCE CO., Defendants and Respondents.

No. 9481.
Submitted January 5, 1955. Decided March 10, 1955.
280 Pac. (2d) 1086.

Mr. Leif Erickson, Helena, for appellant.

Mr. Harold L. McChesney, Helena, Mr. Frank I. Haswell, Whitefish, for respondent.

Mr. Erickson and Mr. McChesney argued orally.

MR. JUSTICE ANDERSON:

This is an appeal from a judgment of the district court affirming an order of the industrial accident board, which order denied the appellant Levo recovery under the Workmen's Com-

pensation Act because of his failure to file a claim within one year after the happening of the accident as is provided for by R. C. M. 1947, sec. 92-601.

The conclusions of law adopted by the industrial accident board which were sustained by the judgment of the district court are as follows:

(1) That claimant suffered an injury as defined by the Workmen's Compensation Act entitling him to compensation upon the filing of a proper claim within one year following said injury:

(2) That by reason of his failure to file claim for compensation within one year following his injury the claimant's claim is barred by the Statute of Limitations and his claim should be denied and dismissed by reason thereof.

Unless there is something in the record which excuses the claimant from his failure to file his claim within a year we must sustain the district court and the industrial accident board.

This court has held that equitable estoppel may prevent a defendant from contending that a claim was not filed in time. McCoy v. Mike Horse Min. & Mill Co., 126 Mont. 435, 252 Pac. (2d) 1036; Lindblom v. Employers' Liability Assurance Corp., 88 Mont. 488, 295 Pac. 1007.

In the instant case the claimant knew the extent of his injuries and in this respect the facts differ from the McCoy case, supra, and it is argued that for that reason the doctrine of equitable estoppel does not lie, yet we find language used in the McCoy case which is most cogent here in determing the results hereinafter announced. Quoting from this case it is said [126 Mont. 435, 252 Pac. (2d) 1039]: "A liberal construction of the Compensation Act is commanded in order that the humane purposes of the legislation shall not be defeated by narrow and technical construction, and the intention of such requirement is for the benefit and protection of the injured workman and his beneficiaries. Twedie v. Industrial Accident Board, 101 Mont. 256, 53 Pac. (2d) 1145; Edwards v. Butte & Superior Min. Co., 83 Mont. 122, 270 Pac. 634."

It becomes important to point out that the record leaves no

doubt but what Mr. Levo, the claimant, General-Shea-Morrison, the employer, Liberty National Insurance Company, the insurer, and the industrial accident board, all believed at the time the accident occurred, that the injury which Mr. Levo sustained was not compensable as contemplated by the Workmen's Compensation Act. A few excerpts from the record bear this out.

The date of the accident was November 18, 1951, about which there was no dispute. To a claim filed by the claimant February 18, 1953, the Liberty National Insurance Company, through its agent, said among other things: "We are liable only for accidental injuries arising out of and in the course of employment. There is nothing in your claim to substantiate accidental injury, rather your condition would appear to be one the result of disease."

There is also evidence in the record to the effect that Mr. Levo was presented with an ambulance bill, the payment of which had been turned down by Liberty National Insurance Company. This bill was presented to Mr. Levo shortly after the accident occurred and before any claim for compensation had been filed with the industrial accident board.

The claimant, Mr. Levo, testified in part as follows when asked about what he had done about filing a claim: "I was wondering about compensation. He [Mr. Duffy, a friend and agent of claimant] said he would go up there for me and find out. He went up to the dam and contacted Mel Hord [the assistant project manager], and Mel Hord told him there wasn't a thing in the world they could do for it at all. Q. Did he provide Mr. Duffy with a claim blank for filing? A. No, Mr. Duffy asked for them, he didn't give him any, said 'No use, nothing we could do.'"

Mel Hord was the personnel manager and assistant project manager for the employer. Mr. Duffy corroborated what was said by claimant and Mr. Hord had the following to say when asked the following question: "Q. Now you said that on Mr. Duffy's testimony which reads, 'Jim, that doesn't come under compensation, nothing we can about this, there is no accident

about that.' That was approximately a correct statement of the conversation that occurred that referred to compensation, is that true? A. I would say in general language, yes."

The record leaves little doubt but what Mr. Mel Hord had the unqualified right to speak for the employer General-Shea-Morrison.

R. C. M. 1947, sec. 92-808, states that every employer of labor and every insurer is required to file with the board a full and complete report of every accident to an employee. This section of the Code is just as compelling as section 92-601 under which the employer and the insurer now seek to avoid payment of the compensation. Yet no such report has ever been filed so far as the record shows. We may draw the conclusion that the employer thought the injury to claimant to be one without the purview of the Workmen's Compensation Act.

Some of the testimony by Mr. Duffy should be referred to here.

"Q. Did you have a conversation with Mel Hord about Mr. Levo's complaint? A. I did right there.

"Q. Tell us what the conversation was. A. I told him he was just the man I wanted to see. Wanted to see him about Art Levo. He said, 'How is Art getting along?' I said nobody knew just how he was making it. At the same time was better today. I was interested in getting the necessary blanks to file a claim. His sister was going to take care of filing a claim. He said: 'Jim, that doesn't come under the compensation. Nothing we can do about this. There is no accident about that.'

"Q. Did he indicate he knew Mr. Levo had suffered this heart attack? A. Yes, he did. He asked me how he was getting along and what I thought his chances were. I asked him again for the blanks. He said, 'Won't do any good, just a waste of time monkeying with them.' I took him at his word and reported to Art and his sister.

"Q. Did you report to Art the substance of the conversation as you told us? A. I did.

"Q. Was it your conclusion compensation was not allowable for Art's attack under the circumstances? A. I got the belief

that that must be the fact. I thought he knew what he was talking about.''

Mel Hord testified that in any event the claim blanks were not kept by him but were at the first aid station. This of course in no way refutes what was said to Duffy.

The claimant, Mr. Levo, was asked:

''Q. Were you satisfied with Mr. Duffy's report on that to you? A. No, I wasn't.

''Q. What did you do? A. I had Dan Korn come up to the hospital.

''Q. Do you know whether he was representing General-Shea-Morrison as their attorney? A. I am quite sure he was. I was under the impression that he was General-Shea-Morrison's lawyer.

''Q. Is that the reason you talked to him? A. That's right.

''Q. That conversation occurred in the hospital? A. Right in the hospital.

''Q. Do you know when that was? A. Shortly after I was in there, I believe I was still taking oxygen, if I remember right.

''Q. What was the conversation? A. I asked him what could be done about compensation? He said, 'Not a thing, there isn't a thing in the world, just one of those things. Too damn bad nothing we could do about it.' ''

Dan Korn's advice in no way justifies a different conclusion than the one reached by claimant and the fact that he was not on a retainer but a mere fee lawyer for the employer gives no reason why the claimant, a workman, should not draw the conclusion that he did. We would be giving the Act a narrow construction if we concluded that a workman would be bound to differentiate between a fee basis lawyer and one on a retainer basis.

As to the period following the conversation with Mr. Dan Korn, the lawyer, Mr. Levo was asked:

''Q. Did you make any further effort to file a claim? A. I figured it was no use, took them at their word after the lawyer told me there was nothing I could do. That is the reason I didn't file a claim.

"Q. How did you come to file a claim when you did? A. I heard about a case, that is how I happened to file.

"Q. As soon as you heard about the Mapston Case you had Mr. Byers of the electrician's union contact me? A. That's right. Also asked him if he could get forms to fill out from the company. I was afraid if I went up they wouldn't give them to me. So he went up and got the forms for me.

"Q. And how long after you heard of the Mapston Case was that done? A. Oh, within a week, I think, maybe a little longer."

The testimony of Daniel Korn caused the claimant to believe that heart attacks were not covered by compensation, that Mr. Korn knew they weren't covered by compensation because he was a company lawyer, that not a thing could be done about compensation, that "There isn't a thing in the world, just one of those things, too damned bad, nothing we could do about it."

Although the record is silent insofar as it does not tie Dan Korn closely enough to the company so that it could be claimed under the doctrine of equitable estoppel that the company was bound by his advice to the claimant, nonetheless Mel Hord's comments were ones for which the company was responsible and coupled with those of Dan Korn little else could be expected of the claimant than for him to rely upon them.

We hold that as a matter of law, Arthur Levo had a right to conclude what he did and that his failure to file a claim within the statutory time was brought about by the direct intervention of the employer's agents and notwithstanding some differences in the testimony of the various witnesses these were not sufficient to sustain the results reached by the triers of fact and for this reason we are not bound by their findings when they are considered in the light of the statute commanding liberality.

To say the very least, the information that was conveyed to Mr. Levo by the personnel director and the assistant project manager, Mr. Hord, and the further information which was conveyed to him by Mr. Daniel Korn, would be sufficient to put Mr. Levo in a position where he could and did rely on them.

Paraphrasing language used in the case of Great American

Indemnity Co. v. Britton, 86 U. S. App. D. C. 44, 179 F. (2d) 60, the advice here given by the assistant project manager and personnel director and the advice given by a lawyer who the claimant thought to be a company lawyer did not permit the claimant in good consicence to file a claim. Ignorance based on completely erroneous advice from persons who are directly connected with the affairs of the employer can even be more profound and dangerous in its consequence than ignorance based on no advice at all. Such advice effectively prevents a conscientious employee from filing a claim for an award or at least until different advice of equal or higher standing is received. According to the record the conclusion is inescapable that claimant was actually dissuaded from filing a claim by the agents of defendant.

We find that the doctrine of equitable estoppel should be applied under the facts in this cause.

The vital principle is that he, who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Dickerson v. Colgrove, 100 U. S. 578, 580, 25 L. Ed. 618, 619.

The doctrine of equitable estoppel is a flexible one, founded in equity and good conscience; its object is to prevent a party from taking an unconscionable advantage of his own wrong while asserting his strict legal right. Seemingly the only strict legal right that we are asked to adhere to is the statute which was passed solely for the benefit of the employer and the insurance carrier, i. e., the Statute of Limitations.

From the evidence adduced at the hearing in the instant case the several elements of equitable estoppel are sufficiently present.

It is contended that there is involved a question of law as opposed to a question of fact and that the claimant is as responsible for knowing the law regarding the situation as were the insurance company, the employer the industrial accident board and those others involved. However, even if we were to ascribe to the contention that it is solely a question of law, it would be a very narrow construction of the statutes regarding Workmen's

Compensation if this court were to say that a claimant should find it his duty to examine all the technicalities concerning the Workmen's Compensation Act and come to a right conclusion while the employer and the insurance carrier, whose responsibilities are far greater, should be excused because of their misinterpretation of the Act itself, which misinterpretation the employer in turn foisted off upon the claimant. The only question involved is whether or not the condition arising from a heart failure is one for which compensation must be paid. The employer at the time of the accident thought that such a condition was not one which was compensable as is evidenced by the witness Hord. The insurance company had the same thought and Daniel Korn, the attorney who advised the claimant, likewise had the same thought.

It was held in Robins v. U. S., 21 F. Supp. 403, 86 Ct. Cl. 39, that the doctrine of equitable estoppel or quasi estoppel has been extended to prevent a wrong being done wherever in good conscience and honest dealing a party ought not to be permitted to repudiate a previous statement, declaration or action. Certainly if there is any circumstance wherein the doctrine of equitable estoppel should be extended, it is in matters concerning an injured workman, where the law itself says that the Workmen's Compensation Act shall be construed liberally.

The judgment of the district court denying claimant's appeal is reversed and the holding of the industrial accident board to the effect that the claimant's claim for compensation is barred by the Statute of Limitations is reversed with directions to enter judgment according to the other findings of said board which are not inconsistent with this opinion.

MR. CHIEF JUSTICE ADAIR, and MR. JUSTICES ANGSTMAN and BOTTOMLY concur.

MR. JUSTICE DAVIS: (dissenting).

I realize that dissenting opinions are generally of little value. Their office is primarily to voice the exasperation of the author,

because his views have not prevailed, rather than to add to the body of the law. In other words I agree that perhaps my views here are better omitted than written. But they depart so widely from the conclusions upon which the majority of this court have agreed that the temptation to detail the reasons for my disagreement is too strong for me to resist.

But one question was disputed before the board and the lower court, viz., whether R. C. M. 1947, sec. 92-601, which requires the presentation of claims for compensation under the Act "within twelve months from the date of the happening of the accident", bars a recovery by the claimant. The board and the district court answered this question in the affirmative.

The controlling facts are not seriously in dispute. That is, as I view the record our understanding of the case is not blurred by conflicting testimony.

With this background in mind I am first met with the contention that section 92-601, supra, must be liberally construed. As applied to this record I believe that this statute requires no construction. On its face the claimant is barred and recovery by him must be denied, because his claim was presented more than fourteen months "from the date of the happening of the accident". Conversely, this claim must be denied, when measured by the language of the statute alone, because it was not presented "within twelve months from the date of the happening of the accident".

Thus far there is no problem of construction presented for solution. The sole problem is to apply this statute as written to the facts before me. It is clear, unambiguous, certain in its meaning. We may not rewrite its text. Sheridan County Electric Co-op, Inc., v. Montana-Dakota Utilities Co., Mont., 270 Pac. (2d) 742, 744; State ex rel. Westlake v. District Court, 119 Mont. 222, 233, 234, 173 Pac. (2d) 896, 169 A. L. R. 827; State v. Holt, 121 Mont. 459, 481, 194 Pac. (2d) 651; Vaughn & Ragsdale Co., Inc., v. State Board of Equalization, 109 Mont. 52, 57, 58, 96 Pac. (2d) 420; Green v. City of Roundup, 117

Mont. 249, 252, 157 Pac. (2d) 1010; R. C. M. 1947, sec. 93-401-15.

Here then we come directly to the ground upon which the majority of the court have ruled that section 92-601, supra, is inapplicable, and that accordingly a recovery may be had by Levo upon the theory of an equitable estoppel raised against the employer and the insurer, which denies them the right to plead this statute in bar. I wholly disagree with this conclusion.

If an equitable estoppel exists in this case it must stand upon the record before us of two conversations and nothing more: (1) The one between the witness Duffy, who was Levo's friend and agent at the moment, and the witness Hord, who was the employer's personnel or assistant project manager; and (2) the other between Levo himself and the witness Daniel J. Korn, his attorney at the time and his cousin at all times. These facts are not in dispute.

Duffy went to Hord for the claimant Levo to get claim blanks and to find out about compensation. He testified on direct examination that Hord said, "Jim, that doesn't come under compensation; nothing we can do about this; there is no accident about this." When Duffy asked "him again for the blanks" Hord's reply was, "* * * won't do any good, just a waste of time monkeying with them." On cross-examination, Duffy summarized his talk with Hord thus, "We, he told me right then and there Art's case was not covered by compensation, that was no accident, this compensation only covers accidents."

Hord on the stand agreed that Duffy's account of this conversation was "very close to correct", but added on his part without denial (1) that Duffy at no time represented himself to be Levo's agent in the matter, (2) that claim forms were not kept in any of the "company offices other than the first aid station", and (3) that he never refused to give Duffy "compensation blanks whereby Mr. Levo could file a claim." Duffy's own account of what Hord actually said, which is quoted above, I repeat, does not contradict Hord at any point; and there were no other witnesses to this conversation than the two participants.

Nor is it denied that Duffy was not satisfied with what Hord told him. Rather he admits other inquiries made after his talk with Hord of persons who told him that there was coverage "regardless whether it was a heart attack when they worked, should be allowed." One of these persons was Al Royce, the employer's electrical superintendent and the claimant Levo's immediate superior on the job, who told Duffy pointblank, "It has always been my idea when a man was knocked out on the job with a heart attack he was covered."

Duffy told the claimant the "substance of the conversation" with Hord. The record is silent whether he also told Levo of his other inquiries, particularly of his conversation with Royce. There is no doubt, however, that Duffy as Levo's agent and Levo as well were charged with notice that opinions differed radically upon the correct answer to the question whether Levo's case was compensable. And there is no doubt also on the record that the claimant Levo himself was not content with Duffy's report. For he testified that he was not satisfied, and that accordingly he sent for his cousin Daniel J. Korn, an attorney, whom he wanted to draw some papers for him, because the doctor had said he "might be alive today and dead tomorrow."

Korn told the claimant (as is the testimony most favorable to him) that "heart attacks were not covered by compensation", that "he knew it wasn't covered by compensation because he happened to be a company lawyer", that "not a thing" could be done about compensation, that "there isn't a thing in the world, just one of those things. Too damn bad nothing we could do about it."

These conversations all occurred within a month, or thereabouts, after Levo's injury.

There is no intimation in any of these conversations that either Hord or Korn promised or offered or undertook to act in any way for Levo in connection with the filing of a claim by him for his disability. He was not misled by either Hord or Korn in any particular. They merely expressed their opinion at the mo-

ment, an opinion then undoubtedly shared by one out of every two lawyers at the Montana bar.

Affirmatively the record shows further, likewise without contradiction, that Korn had been consulted on occasion by the employer about several matters, that he had been paid for his services on a fee basis, but had never had any general retainer. He had never acted for the employer in any compensation case. There is no evidence at all that Korn ever had any authority, actual or ostensible, R. C. M. 1947, sections 2-123, 2-124, 2-106; Lindblom v. Employers' Liability Assurance Corp., 88 Mont. 488, 295 Pac. 1007; Hartt v. Jahn, 59 Mont. 173, 182, 196 Pac. 153, to represent or speak for either the employer or the insurer in dealing with Levo, or for that matter with anyone, or that Korn assumed any such authority in his talks with Levo, or otherwise. The distinction here is not as the majority puts it between a lawyer ''on a retainer'' and a ''mere fee lawyer''. Rather the undisputed fact is that Korn was neither the lawyer nor the agent of either the employer or the insurer, and that he could not bind either by anything he said whether to Levo or to anyone else.

All the evidence is that the claimant consulted Korn as his own personal attorney to get Korn's opinion upon a question of law, and that he did so with the knowledge Korn had acted as attorney for the employer, a disclosure which Korn frankly made such that Levo could not be misled in any degree. Far from deception practiced here we have the converse: an honest effort made that he (Korn) be not misunderstood. He was not. Nothing that Korn said or did flies in the face of any ethical standard recognized by the profession. To the contrary Korn complied meticulously with the highest ethics of his profession. Even so, I emphasize, neither the employer nor the insurer was in any way responsible for what Korn told Levo. In my opinion this conclusion as a matter of law drawn from this record cannot be avoided.

The evidence is all one way that Levo consulted Korn upon his own initiative to get Korn's opinion upon a question of law,

that he asked for that opinion and got it with the knowledge that Korn had acted also as attorney for the employer.

Specifically, Korn's statement to which Levo and his witness testified that he was "a company lawyer" or "the company lawyer" is no evidence at all against either the employer or the insurer of his authority to speak for either. Phelps v. Union Central Life Insurance Co., 105 Mont. 195, 199, 200, 71 Pac. (2d) 887; Annotations at 3 A. L. R. (2d) 598, 602 et seq.

But I do not rest my dissent alone upon any want of authority in Korn to bind the employer or the insurer. I disagree fundamentally with the majority upon the broad ground that the record here raises no equitable estoppel of any kind as such an estoppel is known to the law.

Lindblom v. Employers' Liability Assurance Corp., supra, which is the classic authority in this court defining the doctrine of equitable estoppel, is but a restatement of the rule elaborated in Waddell v. School District No. 2, 74 Mont. 91, 238 Pac. 884; and both of these decisions are only judicial applications of our controlling statute, R. C. M. 1947, sec. 93-1301-6, subd. 3.

Within the rule there laid down the facts here, as I read the record, do not raise an equitable estoppel, primarily, because neither Hord nor Korn made any representation of, nor did either conceal, any material fact, whether by what they did, or said, or by their silence. True, they gave their opinions of the law applicable to Levo's case, but nothing more. And an opinion by lawyer or layman honestly given upon request is not yet an adequate foundation upon which to build an estoppel. I hold to this view without reference to the question of Korn's authority *vel non* to speak for either the employer or the insurer. Ross v. Commissioner, 1 Cir., 169 F. (2d) 483, 496, 7 A. L. R. (2d) 719; Brumit v. Mutual Life Insurance Co., 178 Tenn. 48, 52, 53, 156 S. W. (2d) 377; Robbins v. Law, 48 Cal. App. 555, 560, 192 Pac. 118; Chicago, etc., Ry. Co. v. Sawyer, 176 Okl. 446, 447, 448, 56 Pac. (2d) 418; Turner v. Spokane County, 150 Wash. 524, 527, 528, 273 Pac. 959, and cases cited; Thomas v. Modern Woodmen of America, 218 Mo. App. 10, 18, 19, 260 S. W. 552;

Ward v. Ward, C. C. N. Y., 131 F. 946, 953, 954, affirmed 2 Cir., 145 F. 1023. Compare Continental Supply Co. v. White, 92 Mont. 254, 270, 12 Pac. (2d) 569.

Again, the estoppel here asserted fails because neither Hord nor Korn knew any fact connected with Levo's case, which was unknown to Levo. Indeed, the evidence is all the other way that Levo knew more about his injury and its serious consequences certainly than Korn or Hord, whose opinions are the heart of the estoppel claimed; and, if their opinions were to be construed as statements of fact, there is no line of evidence to show that they or anyone for that matter knew they were not true. Here even Levo in his brief in this court concedes there was no bad faith; and, while actual fraud may not be an element indispensable to the existence of an equitable estoppel, knowledge of the truth contrary to his statement by the party estopped clearly is; or, what is the same thing, the party estopped must know (a) the truth of the fact stated, or (b) circumstances such that knowledge of the truth of that fact is necessarily imputed to him, but unknown to the other party. Lindblom v. Employer's Liability Assurance Corp., supra; Waddell v. School District No. 2, supra. No such case is made here, for neither Korn nor Hord could have acted in good faith (as is admitted) in making the statements they did, if they had known or believed as a fact that Levo's injury was compensable. Clearly on this record they did not have that knowledge or belief.

I could go further with my analysis of this evidence to show that at other points it does not measure up to the rule recognized in Montana, and generally elsewhere. See Twonko v. Rome Brass & Copper Co., 224 N. Y. 263, 120 N. E. 638. To do so would, however, needlessly extend my dissent. There remain for consideration briefly only the decisions in McCoy v. Mike Horse Min. & Mill Co., 126 Mont. 435, 252 Pac. (2d) 1036, and Great American Indemnity Co. v. Britton, 86 U. S. App. D. C. 44, 179 F. (2d) 60, to which the majority turn for support in their conclusion that an estoppel is raised in this case.

In the McCoy case the claimant for more than a year after his

injury did not know whether his condition was due to his injury or to advancing age despite examinations made by the doctors to whom he was sent for treatment. Levo's case presents a state of fact squarely the opposite. He knew within a month after his injury its nature and the disability he had suffered.

In the McCoy case [126 Mont. 435, 252 Pac. (2d) 1039] a shift boss of the employer told the claimant he " 'ought to go to the accident board and fill out papers, report it to the accident board.' " The claimant then testified, "* * * I just told my shift boss about getting hurt and he said he would report it." There is no testimony at bar remotely corresponding to this evidence in the McCoy record. That decision does not support the conclusion which the majority have reached as I understand it.

A sufficient answer to the Britton citation as authority at bar for Levo is found in its facts and in its own comment upon Kobilkin v. Pillsbury, 9 Cir., 103 F. (2d) 667, which, as I read the opinion there, squares at every corner with my conclusions on this appeal.

I would affirm the judgment below and the board's order denying Levo compensation.